The Board's determination in this matter is erroneous for at least two reasons. One, the combination of Nolan, the SCSI or SCSI-2 standard, the CD wire, and the Read-6-Write-6 commands do not disclose the claimed data stream interceptor of the patent. Two, the Board disregarded the secondary considerations of non-obviousness by applying the wrong legal standard. As to the first point, the Nolan combination operates in a fundamentally different way from the patent. The patent is set up with a data stream interceptor that has to do two things. One, according to Seagate's proposed construction, which was adopted by the Board and is not in dispute in this matter, the data stream interceptor has to distinguish command signals in the data stream from data signals. And the Nolan combination does not do that. Instead, it sets up a phase in which commands or data may be sent, and that does not distinguish the signals in the data stream. Well, why doesn't that, at least in one reasonable way of speaking, distinguish the command signals from the data signals by knowing exactly, in a time slot sort of way, knowing exactly which it is that is coming at a particular time? It doesn't do that in the data stream. The distinguishing is done by setting up a transfer in advance. So even Dr. Long admits that, that the system in Nolan sets the phase and then receives the information. So, for example, in the patent, consider this example. If we have cars in a stream of traffic, I have a data stream interceptor under the patent that examines the cars, determines whether there are drunk drivers or sober drivers in them, then informs the main controller of that information. The main controller then uses that input to decide what to do with the cars. In the Nolan situation, the SCSI interface 15 asks for only sober drivers, only sober drivers are sent, and those drivers, those cars with those drivers in them are sent to the main controller. There is no distinguishing of one or the other in the data stream. Seagate itself explains this the same way. They say, if I want tea, I get tea. Your view depends, to continue your highway analogy, on saying that, for example, you wouldn't be distinguishing the inbound from the outbound traffic on a particular road by saying from 7 a.m. to 9 a.m. only inbound, the rest of the time only outbound. That may be distinguishing, but it's not in the stream. It's done in advance. You're setting up the conditions so that it happens. Well, you're distinguishing the cars in that stream. No, you're not. You're not distinguishing among the cars at any given time, but you're distinguishing with respect to the characteristic you're trying to identify. You know what those cars are doing. You only know if someone else tells you that they are. You can see in the Nolan example, it's like a clock. If it's broken, it may be right twice a day, but you wouldn't know that unless you had another device, a clock, to tell you that that is so. There's nothing in the Nolan device that tells you what's happening. The main controller does everything in the Nolan device. If you look at Figure 2 and the explanation at Appendix 581, it explains how the microprocessor makes all the decisions. It decides based on – there are two decisions that it makes when the incoming data comes in. It decides whether there's data. There's no distinguishing of one from the other. It decides whether there's data, and then it decides to encrypt, yes or no. Those two steps are in Figure 2, and those two steps in Nolan are described as being done by the microprocessor, not by the SCSI Interface 15, which Seagate and the board identified as the computative data stream interceptor. But doesn't the SCSI Interface direct the command signals to the microprocessor and the data to the memory buffer? The host – So in that sense, it is doing some kind of distinguishing. It's sending one set of signals one place and another set of signals another place. Well, so it does so, but based on a setup where the – let's keep in mind the CD wire does not carry any data. It just sets the phase, and then pursuant to that set phase, something comes down the pipe. In the situation of read six, write six, which Seagate identifies, that happens to be only data or only commands, but that's not setting – that's not making a – or distinguishing in the data stream. Seagate and the board keep writing out in the data stream requirement, which is the instruction that Seagate itself advanced and the board adopted without controversy. The host computer is actually the device – the host computer originates the commands, and then the SCSI Interface interprets them and sets up these phases. But again, note when the CD wire sets, there is no data flowing yet. It just sets the phase, and then pursuant to that phase, the data comes. It's one or the other, only in the read six, write six situation. And if you think about it, that's – the invention is about doing data encryption on the fly. It's reading the stream, distinguishing commands in the data stream from data signals, and then deciding what to do with them by informing the main controllers, giving it input. And input is the second thing that the data stream interceptor must do, which is not done in the Nolan device under the proper construction. Claim nine sets the context for that input. The data stream interceptor distinguishes commands from data, and then the main controller uses the input from that distinguishing operation to determine whether to encrypt the incoming signal, incoming data. Isn't that part of the problem? Not that the transparent encryption, and not that there hasn't been a contribution, which – whereby this patent overall distinguishes from Nolan. Perhaps other prior art, but claim nine is so broad that it doesn't distinguish from Nolan. I gather that that was an issue that the board considered and relied on in their invalidation. It did, but it did so by ignoring its own construction of in the data stream. The construction it gave was so – it ignored the in the data stream requirement by setting – by allowing something where, again, Seagate says, if I want tea, I get tea. If I want coffee, I get coffee. And asking for something is not the same thing as distinguishing a stream of fluid where you have to tell one from the other. The claim uses – as to input, the claim uses different terms. It talks about input, and that input is used to inform the main controller to make a decision about the incoming data. Right, and I guess you want us to read the word input as necessarily being the result of the distinguishing done by the interceptor. I think that's a fair way to read the patent. Yeah, so I guess the question is the claim isn't written that way, though. We have this rather broad and just colloquially speaking vague term called input. And so it doesn't even say said input to give us perhaps a clue, and there would be problems there with that kind of writing as well. But I guess I'm – it's not clear to me why input necessarily has to mean what you say it means. It's – in context, that's the only input that's even discussed in the claim. And the main controller uses that input to make a decision about what to do about the incoming data. If you read input as being coextensive with incoming data, then the main controller would not have any input upon which to make a decision. It would be making the decision – it would be doing the determination that the patent claim says is done instead by the DSI or data stream interceptor. If it's – having the main controller do the determination or distinguishing and the determination in one step is not what is claimed. What is claimed is the breakup of those two steps, distinguishing commands from data and then providing that input to the main controller, which makes the determination. Having – taking – reading the two as coextensive would read out the requirement of the data stream interceptor to do anything or provide anything. And that's the same context in which I ask for things in the, again, colloquial sense. If I ask my associate for input on a case, I don't expect her to give me just the case. I'm asking her for her input. That is something about that case. Is it affirmed? Is it overruled? Is there something about that case that makes it pertinent to our matter? I don't expect her to just give me the case. And that's the way Seagate and the board read input. It's too broad. The standard is broadest reasonable construction read from the context of the patent claims, not just in the abstract where an input could do all those – could be just as the signals themselves. The specification is very broad, it seems to me. And it doesn't seem to draw the distinctions that you're telling us distinguish knowing. Well, the specification does say so if you read it with the claims because the claims talk about one and the other. And if there – if you read incoming data coextensive with input, then there would be no need for the data stream interceptor to do anything. The main controller would do everything, and that would read out improperly a limitation of the patent. Okay. All right. So let's hear from the other side, and we'll save you a rebuttal. Is there anything else you need to tell us at this stage? At this stage, I want to talk about the improper standard that the board used for nexus. Okay. You're talking about the nexus of the secondary consideration? Yes. There should have been a presumption of nexus here because all the secondary considerations were about the product, the ExWall product. And according to Dr. Conti's unrebutted declaration, that product, the ExWall, was the invention described and claimed in the patent. So under those conditions, under the WBIP case, we should have been entitled to a presumption of nexus. Instead, the board looked for whether or not those references of the evidence of secondary considerations actually recited an element of the patent. And that's the improper standard. It should have been flipped the other way around. We should have had the presumption of nexus. Your claim, though, says encrypting at least one data stream, not encrypting all data streams, which is what full data encryption, as I understand it, really is. Right. But if you read one data stream as being just one command, which is the way Seagate and the board want to read it, then it makes no sense to distinguish commands in the data stream from data signals. One data stream can't be just one or the other. It has to be both, which we're reading. And I think I want to save my rebuttal time. Okay. We will save your full rebuttal, and we'll see what Mr. Gross has to tell us. Thank you, Your Honor, and may it please the Court. I'd like to address first the issue of distinguished. And I want to start with the general point that the fact that we're using Representative Claim 9 has not been challenged. That is the claim that we're assessing, and that claim is extraordinarily broad. And when we look at the specification, the specification itself is also extraordinarily broad. And what we believe the patent owner is attempting to do is to try to redraft the claim language by putting in words like distinguishing input and the like. And we just don't think that's how the claim reads. And I want to go through sort of step-by-step how this worked with the board. First of all, the board had a construction of data stream interceptor that is not challenged on appeal, and it's extraordinarily broad. One or more components adapted to intercept at least one data stream and distinguish the command or control signals in the data stream from the data signal. That's it. That's not challenged, which means if SCSI 2 in combination with Nolan, we can find at least one data stream where SCSI Interface 15 is distinguishing command and control signals from data signals. It falls within the claim length. In the data stream. Absolutely. The claim length is about that little phrase. Yes. Does the distinguishing have to be done in the data stream? Well, there is a data stream, and then there has to be distinguishing. There doesn't have to be distinguishing occurring literally like timing evaluating currently while there's a data stream happening, but you are distinguishing a data stream. And so if we look at appendix 659, this is where the SCSI 2 standard uses the verb distinguish to say what is occurring in SCSI 2. It literally uses the word distinguish, which is a word found in the claim, and it says the CDIO and message signals are used. I mean, 62 what? I'm sorry, Your Honor. It is appendix 659. 659. It's, I believe, page 42 of the SCSI 2 standard. So where on that page is it? It should be in the middle. I'm sorry, Your Honor. The first margin squared paragraph. Yes, yes. Two paragraphs below the information transfer phase is subheading. And this is SCSI 2 describing how it distinguishes. It says the CDIO and message signals are used to distinguish between the different information transfer phases. Now, remember that the claim says at least one data stream interceptor that distinguishes between command and control and data signal transfers. SCSI 2 is saying right here. Right, but just to focus on this, you understand perfectly well that their argument is not an argument just from the claim language. Their argument is entirely based on the claim construction. The claim construction has the phrase distinguish in the data stream. SCSI 2 doesn't. So talk about why it is that the prior art shows that what the prior art does is distinguishing in the data stream. Yes, Your Honor. When SCSI 2 is saying that the CDIO and message signals are used to distinguish between different information transfer phases, that absolutely is talking about a data stream. The information transfer phases are different phases that involve data passing from the initiator to the target. It's exactly what's happening. SCSI is about the transfer of data, a data stream. What evidence both sides, I guess, expert, I'm asking about expert testimony, spoke to the particular language distinguish in? Distinguish in. Well, I don't think there's a lot of discussion about distinguish in, Your Honor, but I will say this. If you're distinguishing in the data stream, it doesn't matter if you distinguish in advance or if you distinguish currently as it's occurring. And we don't believe in any way what this construction meant when it uses the phrase in the data stream is in advance. If it was going to be in advance, you would need to say that. You can distinguish something in a stream of data in advance or while it's occurring. And just keep repeating, but it has to be a data stream. What if any debate was there between the parties in the process leading to the board's adoption of that claim construction? Was that initially at institution and then just retained in the review? Yes, and there was not a raging debate. Basically what happened was our expert in paragraph 105 gave the examples of the read and write commands. Their expert declaration did not discuss the read or write commands. Then in their opposition brief, they mentioned inquiry and copy commands. And then our reply, we put in our footnote in the reply, our petition in paragraph 105 talks about read and write. And so they were not paying attention to the read write command, which is what the focus of our petition was. And then at the hearing, we discussed whether the read write command distinguishes in the data stream. And our position was it does. You don't need to do it in advance. If you're distinguishing, you're distinguishing. You don't add the phrase in advance. And they talked about the copy and the inquiry command, which are different commands, not the same data stream. So, Your Honor, if, to go back to any example you want, whether it's traffic or whether it's anything else, if I'm distinguishing in the stream of information, in the stream of cars, I'm distinguishing. I can distinguish in advance. I can distinguish currently. I can evaluate and distinguish. I can give directions. But here, the way the distinguishing occurs is SCSI Interface 15 controls and directs the information transfer phases. And in a read six or a write six operation, the SCSI Interface 15 is the interface that says, all right, let's start with a command. And then it gets a command that has only command information. And then it says, all right, now you can give me the data in or the data out, depending on whether it's read or write. And then it gets the read or write information that's, again, separated. So the SCSI Interface 15 is distinguishing between these two information transfer phases. It's directing and controlling them. And the result of its directing and controlling is to distinguish between command information and data information or user data. That's exactly what SCSI does. Now, the fact that SCSI does it, you hear the phrase, in advance, simply means it's distinguishing in advance. And you can distinguish in a data stream in advance or you can distinguish it currently. And so we don't believe that seeing the phrase in the data stream in any way suggests that we're adding a new limitation, which is it cannot occur in advance. So even if you're controlling it, you're directing it, and you're successful, and you know that you're successful, that's somehow a problem. We don't think it is. Then SCSI Interface 15 sends the result. After it distinguishes, it sends the command to the microprocessor 17. And I just want to make this, this is a little of a nuanced point, but switching for a second to input. The host computer obviously has a command. But SCSI Interface 15 is playing a very important traffic role. SCSI Interface 15 is controlling and directing the information transfer phases. So what the SCSI Interface 15 says is, all right, now give me the command. It then sends that command to microprocessor 15. And in Nolan, in Figure 2, there's a flow chart. It actually says input SCSI command. So if you didn't have SCSI Interface 15, it wouldn't work. The host computer couldn't just send stuff directly to the main controller. SCSI Interface 15 is playing a very important role of distinguishing the information transfer phases. And in a read 6 and a write 6 operation, what SCSI Interface 15 is distinguishing is command and control information from user data. It then sends up to the microprocessor input SCSI command. That's literally the first thing that happens. Then as you go down, it makes its encryption decision. So we think input is simply input. It's not distinguishing input. And by the way, in the actual specification, there's no discussion of distinguishing input or we want to make sure everyone understands there's a very special definition of input. There's nothing like that at all. The specification is very broad. So if all that's required is input, and if in Nolan, Figure 2, it says input SCSI command, and if the SCSI Interface 15 is performing this vital function in a read 6 and a write 6 operation of distinguishing a command from user data, and then it sends that command to microprocessor 17, it is giving input. A main controller is receiving input. And by the way, it says receiving input, and then it says determining whether the incoming data would be encrypted. In no way are we suggesting that the input is literally the same as the incoming data. In fact, that wouldn't even make sense. The input is the input SCSI command. That's the SCSI Interface 15 sends the input SCSI command. Whether the incoming data will be encrypted would include commands or user data. So they're not coextensive. They are separate terms. So we're not somehow saying that the word input is superfluous. It has no meaning. The word input and the phrase incoming data are different phrases, and we've never suggested otherwise. Turning briefly to secondary factors, on the issue of secondary factors, what the board did is not apply the wrong standard. If we go to the Appendix 43 that has the board's decision, the board went out of its way to show to this court that it was going to analyze the facts closely and make its own determination. It said things like secondary considerations when present must always be considered. Right. So the board clearly gave a quite full discussion of secondary considerations, much fuller than at least in my experience it typically does. Nevertheless, why is this not a case for a presumption of what we call nexus? Well, Your Honor, the issue of presumption is highly fact-dependent. In other words, it's not the case that if a patent owner makes a presumption argument, the board has to say you've shown a presumption. Right. So because the issue itself of presumption is fact-dependent, and I would say that we could talk about as a legal issue, I believe I'm correctly stating the law that the issue of presumption is fact-dependent, that there's no suggestion that you don't need to make a factual record that creates a presumption. Well, let's say that there is weight to their saying that here there was a patent. It was widely licensed. Yes. It was widely used. That, in fact, there is a presumption that there was a relationship between the invention and the use. Where does that leave? And, therefore, that the secondary considerations are a factor. Now, we know that the use of secondary considerations as they were born, it's part of the entirety of the discussion. Is your sense that how the board treated secondary considerations would, if they were incorrect, would change the result? We don't believe so, Your Honor. We believe that at the end of the board's extensive discussion, the board said it outweighs the evidence of secondary considerations of non-obviousness. We believe it was trying to balance the secondary factors evidence. Back to Judge Toronto and Judge Newman's question about how does this all work in this context with presumption, I want to point out that the WBIP case, which they cited, I have at 201-6 Westlaw, 390-2668. The WBIP case says questions of nexus are highly fact-dependent and, as such, are not resolved by appellate-created categorical rules. If you can just get back to the question I asked, why, on the facts of this case, is there not a presumption? Your Honor, in any case, the patent owner really has two roads we think you can go down. One road is to high-level it and not try to get the presumption. Another one is to try to do the work required to show that the product that the patent owner sells is part of the claim subject matter, that the product that someone was using was part of the claim subject matter. Here, what happened is they had an expert who had a conclusory few paragraphs in an affidavit, and so what happened is they didn't get into that uncomfortable position where they have to explain how their product falls within the claim subject matter or how another product falls within the claim subject matter. When you go down the road of trying to explain to get that presumption— That's the road I'd like to be on. When you just finally give me some particular reason why the presumption doesn't apply. Your Honor, their expert declaration is conclusory. That's why the presumption does not apply. Their expert in no way talks about how the product falls under the claim subject matter. It's a high-level, a few sentences down the road. So you still don't want to actually give me a fact about this case that's different from a procedural fact to explain why the presumption doesn't apply? What we're saying, Your Honor, is this is—the unfortunate position I'm in is this is an abject failure of proof. So we're not in the IPR proceeding examining their actual product and the information around their product and showing this flaw or hole. Instead, what we're saying is if instead of doing an analysis that shows that your product is part of the claim subject matter, you just have some high-level paragraphs, that's not—a board has discretion to say that that's not enough to trigger the presumption. So we didn't do discovery in this case to show that their own product has this problem or that problem. What we said was it's an abject failure of proof. Similarly— pieces of that schematic are found in the claim and then how those pieces in the schematic perform the functions that are recited for those corresponding components in the claim. Yeah, the expert kind of tried to meet us halfway by a high-level, like five or ten paragraphs of high-level discussion. Nothing like a claim chart, nothing that really got into detail, which meant they avoided these situations of, all right, how are you going to apply transparently to your product? How are you going to apply input to your product? How are you going to apply distinguishing to your product? They avoided all that by having some high-level discussion, and so my point, Judge Toronto, is we didn't engage in discovery to get the details. Can I just ask about something that Judge Chen mentioned when your colleague on the other side was up? Their product encrypts in everything. Is that right? Well, I mean, that's what they say it does, yes. Well— So sure. So if they say it does, so maybe that was the nifty thing that made their product commercially successful, praiseworthy, et cetera. The claims don't require that. To follow up on Judge Chen's point and Your Honor's question, the broad nature of the claim creates a huge problem for them on secondary considerations because the broad nature says if you just have one, you just have one, you follow up on this claim. What they're announcing to the world is, hey, we do full disk encryption all the time. That's very different from, hey, we do it at least once. So that actually is way outside of the claim subject matter. That's discussing a product that does things all the time. So from a secondary consideration standpoint, it's the board has discretion to say you haven't done it enough, you haven't shown the claim subject matter, and they in no way have said that the claimed subject matter, what actually the claim shows is in any way driving their commercial considerations. The board went in excruciating detail, and Your Honor, I will confess, on the presumption issue, it's an abject failure of proof argument that we're making, and the board has the discretion to say you haven't met the standard to create the presumption. If you have an expert that has some conclusory paragraphs, that's not enough. Oh, my goodness. I apologize. My time is going in the wrong direction. Well, if it is, let's be sure we've covered the issues. Thank you, Your Honor. OK. Thank you, Mr. Harris. Your Honor, just picking up on that last point, the board did not address the secondary considerations as a failure of proof. It said instead that there's no nexus because the secondary consideration evidence did not recite particular claim elements. And there was a declaration from Inova's expert that laid out the practice of the 995 patent by the products that received the industry praise. In fact, the patent contemplates the invention could be an ASIC. Inova made encryption ASICs. Those ASICs- Can you address just maybe once again the point that Judge Chen first made? It hasn't been enough and shouldn't be enough to show that a product is highly successful and praised and that the product is covered by the patent. That can't be- that isn't, in fact, what it means to say that the product is the invention. Why is this not an example of that if, indeed, the claims would cover any product that did what this says it does on any data stream? And this product does this on all data streams and therefore makes it an extremely attractive thing. Well, I don't know that I'm following your hypothetical, Your Honor, but this is a situation where we have the unrebutted declaration of our expert walking through the claims and saying how this product practices that invention. Right. So let me try to say it a different way. The standard for a presumption of nexus, I think we have phrased as something like a product is the invention. Is means more than practices. Has to mean more than that because- Described and claimed is the word. What's that? The test is, is it the invention that is described and claimed in the patent? Is it, right. But is means more than practice. Otherwise, an electronic device that contains 5,000 different features, one of which is covered by the patent, would enjoy a presumption of nexus. So why aren't the 4,999 other features of this, namely it does this all of the time, not just once, mean that the standard for a presumption is inapplicable? Well, it's not inapplicable in this situation because this is a product that actually only does one thing. It does- But it does it always. And the claim doesn't require that it do it always. Well, no. I don't think the patent works that way, Your Honor. If it is the invention and it does the things according to the claims, then there's a presumption as to the product. If it does it all the- I don't understand doing it all the time versus- On all data streams. On all data streams, right. But it does it in accordance with the claim elements. That is, it has a data stream interceptor that intercepts- The concern is if we conclude the same way the board concluded, that the claim language itself is broad, so broad that it does not require full data encryption. It requires something much less than full data encryption. And then there's a lot of variety on the way up to full data encryption. Then the concern is if you have objective indicia that full data encryption is commercially successful or praiseworthy, that doesn't feel like a complete match to the claimed invention. And so the requirement that in order to enjoy a presumption of nexus that your commercial product has to be- is, in fact, the claimed invention doesn't quite make it under the facts here. Does that make sense? Do you understand the premise of the question? I think I do. I guess what I'm saying is if it's so broad, why is there- should there be a presumption in this case? I think all we can do is go back to the analysis of the case law, which is that it is the invention that the patent describes doing this encryption module in an ASIC. The ASIC only- that has a single purpose. It's not like a cell phone that can do different things. And the evidence in this case is unrebutted. The board didn't go off on lack of proof. It said the nexus wasn't met because it didn't address specific elements, and that's not the test. And the Seagate overlooks the other evidence, which is not just the fact of the declaration that was unrebutted, but their own admissions and their answer to the complaint. They point to the complaint that Inova asserted against them. They overlook the answer. In the answer, Seagate admitted specific things, including that they met with the inventor, Mr. Wan. They entered into agreements, including that for the delivery of ex-wall ASICs, which Dr. Conte testified, unrebutted fashion practice, did the invention, was the invention. They admitted in their press releases and advertising that the touted features enabled by this invention, the ASICs and their chips, their drives, resulted in over a million sales. There's no evidence that Seagate obtained the encryption from anyone during this period other than Inova through these chips. All this adds up to the unrebutted evidence of commercial success and strong circumstantial evidence of copying and licensing. These products were not only sold by Inova to Seagate. They were licensed along with it, licensed as to these very patents. These were single-use devices that did nothing else, and they enabled Seagate to make a lot of money on it. Any more questions? Okay, thank you. The case is taken under submission.  Thank you, Your Honor.